**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

THE CINCINNATI            )
INSURANCE COMPANY         )
a/s/o JASON and           )
MICHELLE HOWARD,          )
                          )
Plaintiff,                )
                          )    CAUSE NO. 3:14-CV-1731
        vs.               )
                          )
LENNOX INDUSTRIES,        )
INC.,                     )
                          )
Defendant.                )

**OPINION AND ORDER**

This matter is before the Court on the: (1) Defendant's Motion
for Summary Judgment, filed by Defendant, Lennox Industries Inc.,
on August 6, 2015 (DE #30); (2) Defendant's Motion to Strike, filed
by Defendant, Lennox Industries Inc., on October 6, 2015 (DE #39);
and (3) Defendant's Request for Oral Argument on Defendant's Motion
for Summary Judgment, filed by Defendant, Lennox Industries Inc.,
on October 8, 2015 (DE #40). For the reasons set forth below, the
Motion for Summary Judgment (DE #30) is **GRANTED IN PART AND DENIED
IN PART**. It is **GRANTED** as to Plaintiff's claims for design defect
and failure to adequately warn, and the Clerk is **ORDERED** to **DISMISS**
these claims **WITH PREJUDICE**. It is **DENIED** as to Count II (strict
products liability) which **REMAINS PENDING**. The Motion to Strike
(DE #39) is **DENIED**. The Motion for Oral Argument (DE #40) is also

**DENIED**.


<u>BACKGROUND</u>

This case arises out of a fire that burned the home of Plaintiff's The Cincinnati Insurance Company ("CIC") insureds, Jason and Michelle Howard ("the Howards"), on June 22, 2012. The Howard's home was insured by CIC, which paid approximately $408,000 as a result of the fire. CIC has brought this suit against Defendant, Lennox Industries, Inc. ("Lennox"), alleging counts of negligence, strict liability, and warranty based upon an air condensing unit ("ACU") designed, manufactured, sold, and distributed by Lennox, that was mounted just outside and adjacent to the Howards' home. CIC argues that electrical arcing between the ACU's compressor and its power source ignited organic material inside the ACU and ultimately caused the fire. CIC claims that the ACU was manufactured, designed, and/or labeled in an unsafe, defective, and inherently dangerous condition. Lennox denies the allegations.

Lennox filed the instant motion for summary judgment on August 6, 2015 (DE #30). CIC filed a brief in opposition on September 22, 2015 (DE #35). Lennox also filed a motion to strike, requesting an order striking Larry Cooper's Investigative Report (DE #35-2) and Brad O'Neal's Engineering Report (DE #35-3) from Plaintiff's designated evidence in opposition to the motion for summary

judgment.  Lennox then filed a reply brief in support of its motion for summary judgment and motion to strike.  (DE #37).[1]

## Undisputed Facts

A fire occurred on June 22, 2012, at the Howards' house located at 57711 El Dorado Drive, Goshen, Indiana.  The house was built in 2007, and equipped with a Lennox 13ACD air condensing unit on its exterior.  (Compl. ¶¶ 3, 5; Jason Howard Dep. pp. 11, 45-46.)  The ACU was installed behind the Howards' home, adjacent to their patio, in an area surrounded by mulch and ornamental grasses.  (Howard Dep., pp. 47.)  Mr. Howard testified that other than spraying the outside of the ACU with a hose, neither he nor anyone else serviced the ACU.  (*Id.*, pp. 44-45.)

Before leaving the house on June 22, 2-12, the Howards set the thermostat in the house to 72 degrees Fahrenheit, and left their ACU running.  Neither Jason Howard nor Michelle Howard was home at the time of the fire.

At approximately 3:11 p.m., the Jefferson Township Fire Department was alerted to the fire.  (Larry D. Cooper, Jr. Dep., p. 78.)  They arrived at the scene at 3:19 p.m., but the home was still heavily damaged.

---

[1]While Lennox did follow the rule and file a separate motion to strike, the Court notes that it would have preferred for Lennox to file a memorandum in support of the motion to strike instead of incorporating those arguments into its reply brief in support of the motion for summary judgment.

CIC designated Larry Cooper, an Investigator with Unified Investigations & Sciences, Inc., as its Federal Rule of Civil Procedure 26(a)(2)(B) witness to testify about the origin and cause of the subject fire. Cooper opined that the subject fire originated inside the ACU. (Ex. C to Lennox's Designation of Evidence in Support of Mot. For Summ. J., Larry D. Cooper, Jr. Dep. Defs.' Ex. 2 to Cooper Dep., p. 100.) Cooper's report states:

> The fire originated at the condensing unit on the west exterior of the home. An electrical malfunction (see engineering report) ignited nearby combustibles including plant life and leaves in the area and inside of the air conditioning unit. The fire spread to nearby combustibles including dried grass and mulch before spreading to the west exposure of the home. The flames progressed upward along the west wall before propagating into the home through the overhang. The fire continued to burn in the attic area resulting in partial collapse of the roof.

(DE #35-2, Cooper's Report, p. 2.) Cooper also believes the fire was caused by "a high-resistant heating or arcing" which ignited "fuels" inside the ACU and then spread to nearby combustibles, including mulch and ornamentals, before spreading to the Howards' home. (*Id.*, pp. 100, 105.) Cooper does not have any opinion regarding how the "high-resistant heating or arcing" occurred or whether the aforementioned electrical event resulted from an unsafe, defective, or inherently dangerous condition associated with the ACU. (*Id.*, pp. 97-100.) Instead, he defers to the opinions and conclusion held by Brad O'Neal, CIC's Federal Rule of Civil Procedure 26(a)(2)(B) witness on the topic of electrical

engineering.

CIC designated Mr. Brad O'Neal, a Senior Forensic Engineer who is also employed by Unified, as its Federal Rule of Civil Procedure 26(a)(2)(B) witness on the topic of electrical engineering. (Ex. D to Lennox's Designation of Evidence in Support of Mot. For Summ. J.; Brad O'Neal Dep. Def.'s Ex. A to O'Neal Dep., p. 1.) O'Neal and his colleagues at Unified examined and tested the ACU and its component parts on two occasions - September 13, 2012 and January 15, 2015. (Ex. D to Lennox's Designation of Evidence in Support of Mot. For Summ. J., pp. 49, 51.) Based upon the exams and testing, O'Neal opines that the fire originated inside the ACU at the compressor connection. (*Id.*, pp. 52, 58, 72-74.) Specifically, O'Neal believes the electrical arcing between the ACU's compressor and its power was the fire's ignition source:

> Therefore it is my opinion that the ignition source, based on electrical arc mapping, was not on the exterior of the condensing unit. Arc mapping placed the fire originating inside the condensing unit, which was also consistent with the fire investigator's area of origin. Further identifying the ignition source at the compressor power connections, which was the farthest failure downstream from an arc severed conductor provide the origin and ignition source for the fire.

(DE #35-3, O'Neal Report, pp. 7-8.)

However, O'Neal specifically testified during his deposition that he is not offering any opinion that the alleged electrical arcing resulted from a defective or unreasonably dangerous characteristic of the ACU:

5

Q:    You're not offering any opinions in this case with regard
      to any manufacturing defect in the Lennox air
      conditioner, correct?

A:    That's correct, no manufacturing defect.

Q:    You're not offering any opinions with regards to design
      defect, are you?

A:    No, I'm not.

Q:    You're not offering any opinions in the area of warnings
      defect, are you?

A:    No, I'm not.

Q:    Okay.  Those are the big three in the world of product
      liability.  Are you aware of any others from your legal
      training?

A:    No, I'm not.

Q:    Okay.  So when I use the word defect, I'm using it in the
      context that we as folks that go to law school learn
      about in law school, and I trust you did, too, that
      defect would include any one of those three components.

*          *          *          *          *

Q:    Do you have any different understanding of the word
      defect in the context of a products liability action than
      those three possible avenues?

A:    I'm not aware of any, no.

Q:    Okay.  And you're not offering opinions on any one of
      them in this case?

A:    That is correct.

Q:    Okay.  Nor are you aware of anyone else on behalf of
      [CIC] who is offering such opinions, correct?

A:    That's correct.

6

```
*          *          *          *          *
```

Q:    Yeah.  So you don't know what caused this alleged arc?

A:    I don't know what caused the arcing, no.  There's – there
      could be, like I said, all different kinds of
      possibilities.

Q:    But we do know that you're not testifying that that arc
      was due to any defect in the equipment, correct?

A:    That's correct.

(Brad O'Neal Dep., pp. 28-29; 140.)

Finally, Plaintiff's experts investigated other potential causes of the fire.  Cooper states that "no evidence of carelessly discarded smoking material was found in this area." (DE #35-2, p. 4.)  O'Neil opined that "[n]o other competent ignition sources were identified which would cause the damage observed; therefore, the arcing at the compressor was the fire's ignition source." (DE #35-3, p. 7.)

DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Motion For Oral Argument

At the outset, the Court will address Lennox's Motion for Oral Argument as to the instant Motion for Summary Judgment. (DE #40.) Pursuant to Local Rule 7-5., the Court may "grant or deny a request for oral argument or an evidentiary hearing in its discretion."

N.D. Ind. L.R. 7-5.(c)(1). Here, the parties' memoranda have sufficiently apprised the Court of the issues at hand, and the Court does not believe that oral argument is necessary. Therefore, the Court denies Lennox's Motion for Oral Argument (DE #40), and turns to the merits of the Defendant's Motion for Summary Judgment.

### Defendant's Motion to Strike

Defendant, Lennox, moves to strike Larry Cooper's Investigative Report (DE #35-2) and Brad O'Neal's Engineering Report (DE #35-3) from Plaintiff's designated evidence in opposition to Lennox's motion for summary judgment. Because the argument in support of the motion to strike is included in Defendant's reply memorandum in support of its motion for summary judgment (DE #37, pp. 4-8), it is a little confusing as to what bases Defendant believes the reports should be stricken. At first, it seems Defendant contends O'Neal's theory is "unsubstantiated" (*id.*, p. 6) and maybe improper under *Daubert* (although that case name is never used by Defendant). But then, Lennox argues that the reports are inadmissible under Rule 56(c)(2) and 56(c)(4), arguing they are inadmissible hearsay because they are not sworn to or subscribed under penalty of perjury. (DE #44.)

Defendants cite *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 482 F.Supp.2d 1045, 1057 (N.D. Ind. 2007), for the

proposition that "an unsworn and unverified expert report is not Rule 56 evidence that may be relied upon to overcome a motion for summary judgment." (DE #44, p. 1.) While the Court made that observation in *Howmedica*, it went on to rule that "[h]owever, rather than deciding this case on hypertechnical grounds, the Court will decide the case on its merits." 482 F.Supp.2d at 1057. Motions to strike are heavily disfavored, and usually only granted in circumstances where the contested evidence causes prejudice to the moving party. *Kuntzman v. Wal-Mart*, 673 F.Supp.2d 690, 695 (N.D. Ind. 2009); *Gaskin v. Sharp Elec. Corp.*, No. 2:05-CV-303, 2007 WL 2228594, at *1 (N.D. Ind. July 30, 2007). This Court can consider the expert's reports, without the need to employ a motion to strike. Therefore, the motion to strike is denied to the extent it challenges the admissibility of the expert reports.

To the extent the motion to strike challenges the sufficiency of the expert opinions expressed in the reports, Federal Rule of Evidence 702, which governs expert testimony, provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is a product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702. In addition, in *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court fashioned a two-prong test of admissibility for evidence based on the "scientific knowledge" mentioned in Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). To be admissible, evidence must be both relevant and reliable. *Id.* at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (noting the objective of court's gatekeeping requirement is to ensure reliability and relevancy of expert testimony).

Under the reliability prong, scientific evidence must be reliable in the sense that the expert's testimony must present genuine scientific knowledge. *Daubert*, 509 U.S. at 592-93; *Deimer v. Cincinnati Sub-Zero Prods. Inc.*, 58 F.3d 341, 344 (7th Cir. 1995). Generally, the expert witness must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the witness's field. *Kumho*, 526 U.S. at 152. Specifically, a court may, but is not required to, consider a nonexclusive list of four factors in assessing reliability: (1) whether the expert's theories and techniques can be verified by the scientific method through testing; (2) whether the theories and techniques have been subjected to peer review and publication; (3) whether the theories and techniques have been evaluated for their

11

potential rate of error; and (4) whether the theories and techniques have been generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

Under the relevance prong, the testimony must assist the trier of fact to understand the evidence in the sense that it is relevant to or "fits" the facts of the case. *Daubert*, 509 U.S. at 591; *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In other words, the testimony must be such that the jury can apply it in a meaningful way to the facts at hand. This "fit" analysis essentially represents an inquiry similar to if not indistinguishable from the basic evidentiary inquiries into whether evidence is relevant and, if so, whether its probative value is nonetheless substantially outweighed by, among others, the danger of unfair prejudice and jury confusion. *See Daubert*, 509 U.S. at 595; *Ayers v. Robinson*, 887 F. Supp. 1049, 1058-59 (N.D. Ill. 1995).

In this case, the Court finds the expert reports of Cooper (the Origin and Cause Investigator) and O'Neil (the Electrical Engineer) are both reliable and relevant. Both experts used the scientific method and relied upon NFPA 921 to conduct their investigations and reach their conclusions. Cooper looks to identify the origin of a fire, then attempts to "identify competent sources of ignition within that origin." (Cooper Dep., p. 21.) In reaching the conclusion that the fire occurred in the ACU

manufactured by Lennox as a result of an electrical malfunction (DE #35-2, p. 8), Cooper examined the scene twice, identified and interviewed potential witnesses, researched the ACU, obtained and read the fire report and researched the weather on the day of the fire. (*Id.*, pp. 3, 7.) As such, he collected facts and data in accordance with National Fire Protection Association Publication ("NFPA") 921, which is a recognized guide for use by fire investigators in the fire investigation process. *See State Farm Fire & Cas. Co. v. Electrolux Home Products, Inc.*, 2013 WL 3013531, at *6 (N.D. June 17, 2013) ("courts throughout the country have held the NFPA 921 methodology reliable under Fed. R. Evid. 702").

Similarly, O'Neil also utilized NFPA 921 in conducting his investigation. O'Neal attended the second examination of the ACU, and identified arcing on the connection between the compressor and the power source. (DE #35-3, p. 6.) Additionally, he reviewed Cooper's findings, inspection photos, and conducted a laboratory exam. (*Id.*, pp. 3-4.) O'Neal also used information from a class (taught by Mr. Olsen, Defendant's expert Electrical Engineer), that he had attended. When challenged during his deposition to identify any text that supported O'Neal's statement that the plug body connected to the compressor could combust, O''Neal cited Olsen's text associated with the class "Electric Heat Generation for Fire Investigators with extra materials on heat-induced arcing and arc mapping." (DE #43-6, p. 75.) According to Olsen, that same text

states that arcing can be a candidate for the cause of a fire (rarely a candidate, yet, a candidate). (*Id.*, p. 77.) O'Neal testified that NFPA states that "if there is a single arc that you identify, it is the most likely, most probable, the ignition source of the fire." *Id.*

In sum, both experts gathered relevant data, applied it to the NFPA, and reached their scientific conclusions. Their expert testimony will clearly help a jury in determining the cause of the fire at issue. As such, the testimony and reports of both O'Neal and Cooper are both reliable and relevant, and are therefore admissible under *Daubert*.

### Motion for Summary Judgment

1. ### Defective Design and Adequate Warning Claims

In Count I, Plaintiff states a claim for negligence in its complaint, alleging, *inter alia*, that Lennox was negligent in "defectively designing" and "failing to provide adequate warnings, instructions and guide for the Air Conditioner and its component parts." (Compl., DE #5, p. 3.) In its memorandum in support of the motion for summary judgment, Lennox argues that CIC has not come forward with any evidence from which a trier of fact could conclude that the ACU was defectively designed or had defective warnings. (DE #31, pp. 9-10.) In its response memorandum, CIC completely fails to address the arguments on design defect or

failure to warn.

To establish a prima facie case under a design defect theory, Plaintiffs must establish: (1) the manufacturer placed into the stream of commerce a defectively designed, unreasonably dangerous product; (2) a feasible safer alternative product design existed; and (3) the product defect proximately caused the plaintiff's injury. *See, e.g., Barnard v. Saturn Corp.*, 790 N.E.2d 1023, 1032 (Ind. Ct. App. 2003). Regarding the theory of negligent failure to provide adequate warnings, a product is defective if the seller fails to: (1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product; when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer. Ind. Code § 34-20-4-2. Courts have held that where Plaintiffs have failed to show a defective design, there is no duty to warn. *See American Optical Co. v. Weidenhamer*, 457 N.E.2d 181, 187 (Ind. 1983) ("Absent proof of a dangerous instrumentality, or proof of a defect or improper design making an otherwise harmless instrument dangerous, there is no duty to warn of product connected dangers."); *Rogers v. Ford Motor Co.*, 952 F. Supp. 606, 617 (N.D. Ind. 1997) (explaining "it is axiomatic that there can be no duty to warn where no design defect has been shown").

In CIC's response to the instant summary judgment motion,

Plaintiff completely fails to respond to CIC's arguments regarding design defect and failure to warn. Lennox's arguments on these points are therefore waived. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) ("because [plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this Court, his negligence claim is deemed abandoned"); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to summary judgment motions are deemed waived). Accordingly, the Court grants summary judgment in favor of Lennox on the claims of design defect and failure to adequately warn.

2.   <u>Count II - Strict Products Liability</u>

To establish a prima facie case of strict liability for a manufacturing defect, the plaintiff must show that: (1) the product is defective and unreasonably dangerous, (2) the defective condition existed at the time the product left the defendant's control, and (3) the defective condition is the proximate cause of the plaintiff's injuries. *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 160 (Ind. Ct. App. 1997). A product is defective when it is in a condition not contemplated by the expected users, and is unreasonably dangerous when used properly. Ind. Code § 34-20-4-1. The plaintiff has the burden of proving that the product

16

was in a defective condition that rendered it unreasonably dangerous. *Smock Materials Handling Co., Inc. v. Kerr*, 719 N.E.2d 396, 401 (Ind. Ct. App. 1999). Generally, the mere fact that an accident occurred does not create an inference of a defect in a products liability case. *See Smith v. Michigan Beverage Co., Inc.*, 495 F.2d 754, 757 (7th Cir. 1974).

Lennox argues that Plaintiff has put forth insufficient evidence to prove that the ACU was defective. In response, CIC cites *Ford Motor Co. v. Reed*, 689 N.E.2d 751 (Ind. Ct. App. 1997), for the proposition that a plaintiff can prove a product defect by using any of four methods: Plaintiffs may produce an expert to offer direct evidence of a specific manufacturing defect; plaintiffs may use an expert to circumstantially prove that a specific defect caused the product failure; plaintiffs may introduce direct evidence from an eyewitness of the malfunction, supported by expert testimony explaining the possible causes of the defective condition; and plaintiffs may introduce inferential evidence by negating other possible causes. *Reed*, 689 N.E.2d at 753.

This Court has already analyzed *Reed* and its similar line of cases in *Gaskin v. Sharp Electronics Corp.*, No. 2:05-CV-303, 2007 WL 2819660 (N.D. Ind. Sept. 26, 2007), another products liability case which revolved around the standard of proof for a manufacturing defect that arose from a fire. In *Gaskin*, this Court

recognized the Seventh Circuit decision in *Whitted*, which concluded that:

> We find that under the Indiana Strict Product Liability Act a plaintiff may use circumstantial evidence to establish that a manufacturing defect existed only when the plaintiff presents evidence by way of expert testimony, by way of negating other reasonably possible causes, or by way of some combination of the two.

*Whitted* v. General Motors Corp., 58 F.3d 1200, 1209 (7th Cir. 1995). Ultimately, this Court concluded in *Gaskin* that:

> Following the Seventh Circuit in *Whitted* and the Indiana Appellate Court in *Reed*, this Court recognizes the four factors set forth in *Reed* as "helpful tools" in the basic inquiry as to whether there is sufficient evidence of a defect, and recognizes that in some rare circumstances, circumstantial evidence can produce reasonable inferences from which a jury can reasonably find that the defendant manufactured a product containing a defect. *Reed*, 689 N.E.2d at 754; *Whitted*, 58 F.3d at 1208; *see also Smith v. Ford Motor Co.*, 908 F. Supp. 590, 593 (N.D. Ind. 1995) ("[t]he notion that a plaintiff may use circumstantial evidence to prove a defect in an Indiana products liability case was recently reaffirmed by the Seventh Circuit in *Whitted*"). "By the very nature of fire, its cause must often be proven through a combination of common sense, circumstantial evidence and expert testimony." *Westchester Fire Ins. Co. v. American Wood Fibers, Inc.*, No. 2:03-CV-178-TS, 2006 WL 752584, at *13 (N.D. Ind. Mar. 21, 2006) (quoting *Standard Commercial Tobacco Co., Inc. v. M/V Recife*, 827 F. Supp. 990, 1001 (S.D.N.Y. 1993)). This Court agrees with the writings of the court in *SCM Corp. v. Letterer*, 448 N.E.2d 686 (Ind. Ct. App. 1983): The courts would obviously prefer, even in a strict liability case, to have proof of a specific defect causing the harm. But this is not always possible, especially in cases where

> the product has been destroyed due to its
> malfunction. Most often the failure to
> produce the product will have a bearing only
> on the reliability of the circumstantial
> evidence of causation. If there is sufficient
> other evidence that harm was caused by some
> unspecified defect and no other cause likely,
> the plaintiff ordinarily has made a
> submissible cause. *SCM*, 448 N.E.2d at 691
> (quoting 1 Frumer & Friedman, Products
> Liability § 11.01[3][A], 217).

*Gaskin*, 2007 WL 2819660, at *6-7.

This case is factually similar to *Reed*, where the plaintiff was injured by a car fire that occurred in his garage. Although the plaintiff's expert testified that the fire started in the car's center console, no witness could pinpoint the identity of the specific defect. However, the plaintiff "all but eliminate[d] every possibility but a defect in the console." *Reed*, 689 N.E.2d at 755. The car was owned for only five months, and the expert indicated that the cause of the fire was some type of electrical defect within the center console. *Id.* The court found that evidence enough for the jury to conclude that some defect in the console caused the fire. *Id.*

Similarly, in this case, Plaintiffs have produced two experts. Cooper found that the fire originated at the ACU. (DE #35-2, p. 2.) O'Neal also opines that the ignition source was the ACU; specifically, that arc mapping placed the fire originating inside the condensing unit, which was also consistent with the fire investigator's area of origin. (DE #35-3, pp. 7-8.) Howard

testified that other than spraying the outside of the ACU with a hose, neither he nor anyone else serviced it, therefore, it had not been altered after it left Lennox's possession. (Howard Dep., pp. 44-45.) Finally, Cooper and O'Neil investigated other potential causes of the fire, and ruled out other sources. (DE #35-2, p. 4; DE #35-3, p. 7.) Specifically, Cooper's report states that "[n]o evidence of carelessly discarded smoking material was found in this area" (DE #35-2, p. 4), and O'Neil ultimately concluded that "[n]o other competent ignition sources were identifies which would cause the damage observed; therefore, the arcing at the compressor was the fire's ignition source" (DE #35-3, p. 7).

While Lennox contends that Plaintiff has not properly eliminated all causes of the fire (including failure to properly maintain and service the ACU and thoroughly rule out careless smoking), as this Court recognized in *Gaskin*:

> "The plaintiff in a products liability suit is not required to exclude every possibility, however fantastic or remote, that the defect which led to the accident was caused by someone other than the defendants." *Smith*, 908 F. Supp. at 596 (quoting *Wedge v. Planters Lifesavers Co.*, 17 F.3d 209, 211 (7th Cir. 1994)); *see also Henderson v. W.C. Haas Realty Management*, 561 S.W.2d 382, 386 (Mo. Ct. App. 1977) ("it is not required that the evidence exclude all possibility of another origin or that it be undisputed; it is sufficient if all the facts and circumstances in evidence fairly warrant the conclusion that the fire did not originate from some other cause"). As noted by the Court in *Smith*, "[i]f plaintiff were required to disprove every possible eventuality, virtually no products liability action could ever survive summary judgment." *Smith*, 908 F. Supp. at 596.

*Gaskin*, 2007 WL 2819660, at *7.

Viewing the facts in the light most favorable to the nonmovant, as this Court must at this stage of summary judgment, it finds that Plaintiff has sufficiently eliminated other reasonably possible causes, and has satisfied the fourth method of proving a manufacturing defect as annunciated in *Whitted* and *Reed*. As such, summary judgment is inappropriate on Count II, for manufacturing defect.

3.   <u>Breach of Warranty (Count III)</u>

The Court makes a final note that Count III states a claim for breach of warranty, alleging Lennox breached its warranty "by manufacturing, designing, selling and distributing a defective un-merchantable Air Conditioner." (*Id.*, p. 6.) CIC does not argue in its motion for summary judgment or memoranda in support that it is entitled to summary judgment on Count III for breach of warranty (indeed, neither party addresses the breach of warranty claim at all); therefore, Count III survives and remains pending.

<u>CONCLUSION</u>

For the reasons set forth below, the Motion for Summary Judgment (DE #30) is **GRANTED IN PART AND DENIED IN PART**. It is **GRANTED** as to Plaintiff's claims for design defect and failure to

adequately warn, and the Clerk is **ORDERED** to **DISMISS** these claims **WITH PREJUDICE**. It is **DENIED** as to Count II (strict products liability) which **REMAINS PENDING**. The Motion to Strike (DE #39) is **DENIED**. The Motion for Oral Argument (DE #40) is also **DENIED**.


DATED:     February 9, 2016          /s/ RUDY LOZANO, Judge
                                     United States District Court